### IN THE

# SUPREME COURT OF JUDICATURE

### OF THE

## STATE OF INDIANA,

AT INDIANAPOLIS, NOVEMBER TERM, 1870, IN THE FIFTY-FIFTH
YEAR OF THE STATE.

---

## THE UNION RAILROAD AND TRANSPORTATION Co. and Another *v.* YEAGER and Another.

CUSTOM.—*Certainty.*—Where, in attempting to show, in explanation of a contract of sale, a local commercial usage that cash sales were not made for cash in hand, but that payment might be made afterwards and the transaction still be regarded as a sale for cash, the evidence was uncertain as to the number of days given and whether the time given was computed from the date of the sale or the date of delivery, and showed that the usage of giving time ceased soon after the transaction in question;
*Held,* that the evidence was insufficient to prove the custom.

SALE.—*Delivery.*—*Bill of Lading.*—A. purchased a quantity of flour to be manufactured by a certain mill in St. Louis, Mo., and a parol agreement was made by A. and B. for the sale of the flour by the former to the latter for cash on delivery. Afterwards a freight company, which owned no means of transportation, gave B. an instrument styled a bill of lading, dated before the flour had been manufactured, by which said company acknowledged the receipt by it of the flour from B. and agreed to transport it to C. at Boston, Mass. A few days afterwards the servants of a transfer company, an organization engaged in carrying freights across the river at St. Louis, took the flour from said mill, conveyed it across the river, and put it in the custody of a railroad company for which said freight company acted as agent, receiving a certain percentage for all freights obtained for said railroad, said transfer company giving the superintendent of said mill dray tickets for the flour, and receiv-

ing from said railroad company a bill of lading for the flour to be delivered to
C. at Boston.   The barrels had been marked at the mill with B.'s brand with-
out the knowlege of A.   Before the flour was taken from the mill B. drew
on C. for a certain amount payable to the order of the former, chargeable to
account of the flour, and for value sold the bill of exchange to a bank and
transferred to said bank the instrument so given by said freight company to B.
the bank having no notice of any claim on the flour in favor of A.   Hearing
of the embarrassment of B., who a few days afterwards became insolvent, A.
inquired of the superintendent of the mill about the flour, received from him
said dray tickets, and the day:after the delivery of the flour to the railroad
company went with said tickets and a bill for the flour to B. and requested
payment, which not being made, A. told B. that he would keep the tickets and
make other disposition of the flour, and went to the railroad company with
said tickets and demanded a bill of lading, which was refused.   No order,
oral or written, was given by A. for the delivery of the flour from the mill,
but the agents of the transfer company received their orders from the agent of
said freight company, who received his authority from B.

*Held,* that A. was still the owner of the flour and entitled to its possession.

*Held,* also, that said instrument given by said freight company to B. could not
be regarded as a bill of lading.

APPEAL from the Marion Circuit Court.

Downey, J.—This action was brought by the appellees
against the appellants for the recovery of the. possession of
four hundred barrels of flour, branded "196, Little Beauty
XXX, Lamb & Quinlin sole agents for city trade, St. Louis,
Mo.," of which it was alleged the defendants had the posses-
sion, without right, and which they unlawfully detained from
the plaintiffs at the county of Marion.   •

On affidavit filed, alleging that the said property was un-
lawfully detained from the plaintiffs by the defendants, and
containing the other statutory requisites, an order of seizure
was issued, by virtue of which the property was taken by
the sheriff from the possession of the defendants and delivered
to the plaintiffs.

On her petition, the "Merchants National Bank of St.
Louis, Missouri," became a party to the action, as a defendant.

The Union Railroad and Transportation Company an-
swered: first, a general denial; second, that the flour was,
on or about the 28th day of September, 1867, owned by Lamb
& Quinlin, who then resided in St. Louis, Mo.; that they con-

signed and shipped, at about said date, said flour, over the line of this defendant, to C. Maynard & Son, Boston, they, the said Lamb & Quinlin, being the owners thereof, and took a bill of lading therefor, and drew a bill of exchange for four thousand four hundred dollars at sight, on said C. Maynard & Son, on account of said consignment, and that said Lamb & Quinlin sold said bill of exchange and bill of lading to the Merchants National Bank of St. Louis, Mo., while the flour was in transit and before it reached Indianapolis, and said bank became the *bona fide* owner of said bill of exchange and bill of lading and flour before it reached Indianapolis, and this defendant was the carrier of said flour, and said flour was replevied out of the possession of this defendant by said plaintiff when it had arrived at Indianapolis on its way to Boston; and that she was and is entitled to possession of said flour as carrier aforesaid for the owners thereof, the Merchants National Bank of St. Louis, Mo., and that said bill of exchange is wholly unpaid; wherefore, &c.

The Merchants National Bank of St. Louis, Mo., answered: first, a general denial; second, substantially the same facts set up in the second paragraph of the answer of the Railroad and Transportation Company, and claiming the ownership and right to the possession of the bill of lading, bill of exchange, and the flour.

Each of the defendants, that is to say, the Railroad and Transportation Company and the Merchants National Bank of St. Louis, afterwards filed a third paragraph of answer, alleging, that the flour was the property of the plaintiffs on the — day of September, 1867, and that they on that day sold the same to Lamb & Quinlin, merchants, of St. Louis, and they took possession of it by virtue of said sale, and delivered it to the carrier, took a bill of lading therefor, and sold said bill of lading and said flour to the said bank, who bought the same for a valuable consideration and without any knowledge of any claim the plaintiffs had on said flour, and that said bank is a *bona fide* purchaser of said flour, without notice; wherefore, &c.

The plaintiffs replied to the second and third paragraphs of the answers of the Railroad and Transportation Company, and of the Merchants National Bank of St. Louis, separately; but we need not set them out separately.    They are substantially the same, and are as follows: First.  A general denial.  Second.  That on the — day of——, 1867, at the city of St. Louis, Mo., the plaintiffs bargained to said Lamb & Quinlin the said flour for — dollars per barrel, to be paid for, cash on delivery; that at the time of said sale, said flour was in the custody of one ————, who held the same for plaintiffs, and that said Lamb & Quinlin fraudulently and without right, and without paying the agreed price therefore or any part thereof, and without the knowledge or consent of plaintiffs, took and obtained the custody of said flour and shipped the same to Boston; that plaintiffs recovered the possession of said flour by writ of replevin herein, while the same was in transit, as they lawfully might; and that said Lamb & Quinlin have never paid said agreed price or any part thereof.

Third.  That on, &c., they bargained said flour to Lamb & Quinlin, for cash on delivery, and not on credit; that said flour was then in custody of a third person for plaintiffs' use; that Lamb & Quinlin, before any part of said flour had been delivered to them, and before they had paid any part of the price thereof, and while said flour was still in the custody of the plaintiffs, obtained from the said Union Railroad and Transportation Company the said bill of lading in said answer mentioned, without the delivery of any flour to said company or its agents; that said Lamb & Quinlin, afterwards, without the knowledge or consent of plaintiffs and without paying said agreed price, or any part of it, wrongfully took said flour into their possession and delivered the same to said company for shipment to Boston; that said Lamb & Quinlin being still in default in paying said agreed price or any part thereof, plaintiffs by the writ of replevin herein, took and recovered the possession of said flour, as they lawfully might do; wherefore, &c.

Fourth.  That at the time of issuing the said bill of lading

The Union R. R. and Transp'n Co. and Another v. Yeager and Another.

in the answer mentioned, said Lamb & Quinlin were not the owners of, or in the possession of, said flour, but the same was and still is the property of the plaintiffs.

Fifth. That at the time of issuing the said bill of lading, and at the time of the drawing of said bill of exchange in said answer mentioned, the said Lamb & Quinlin were not the owners or in possession of said flour, but the same then was and still is their property; wherefore, &c.

Sixth. That on, &c., the plaintiffs, being the owners of the flour, bargained and sold the same to the said Lamb & Quinlin for — dollars per barrel, which price was, by the terms of said sale, to be paid in cash on delivery, and the property in said flour was to remain in said plaintiffs until payment of the whole of said price; that said Lamb & Quinlin obtained the possession of said flour and failed and refused, and have ever since failed and refused, to pay any part of said price, and without right shipped said flour to the city of Boston for sale and became insolvent; and that because of the failure of said Lamb & Quinlin to perform said condition, plaintiffs repossessed themselves of said flour by the writ of replevin herein, as they lawfully might do; wherefore, &c.

The defendants demurred to the several paragraphs of the reply, except the first, which demurrers were all overruled, and an exception was entered. The action was dismissed as to Samuel F. Gray, who was an original defendant.

There was a trial by jury, and a verdict for the plaintiffs, that they were the owners and entitled to the possession of the four hundred barrels of flour in the complaint mentioned, and that the same were wrongfully detained by the defendants at said county of Marion; that said flour was of the value of five thousand dollars; and they assessed the plaintiffs' damages for the detention of said flour at one dollar. The jury also found specially, in answer to interrogatories, as follows:

"1. Did not the plaintiffs sell the four hundred barrels of flour in controversy to Lamb & Quinlin?" Answer, "Yes."

"2. Was not said flour manufactured at the Union Steam Mills, for Yeager & Co.?" Answer, "Yes."

"3. Did not Yeager & Co., after they sold the flour to Lamb & Quinlin, notify Fruedenau, the superintendent of the Union Steam Mills, that he had sold said four hundred barrels of flour to Lamb & Quinlin?" Answer, "Yes."

"4. Did not said Fruedenau, previous to said notification from Yeager & Co., refuse to deliver said flour to the transfer company?" Answer, "Yes."

"5. Did not said Freudenau, after he had received said notice from Yeager & Co., deliver said flour to said transfer company?" Answer, "Yes."

"6. Did not Lamb & Quinlin send said transfer company for said flour?" Answer, "No."

"7. Did not said Fruedenau know that said transfer company came for said flour on account of Lamb & Quinlin?" Answer, "No."

"8. Did not said Lamb & Quinlin obtain permission of and ship said flour in consequence of having purchased the same of plaintiffs?" Answer, "No."

"9. Did not Lamb & Quinlin ship said flour from St. Louis to Boston and obtain a bill of lading therefor from the carrier?" Answer, "Yes."

"10. Did not said flour reach Indianapolis upon its shipment by Lamb & Quinlin?" Answer, "Yes."

"11. Did not Lamb & Quinlin ship said flour to Maynard & Son, Boston, Massachusetts?" Answer, "Yes."

"12. Did not Lamb & Quinlin draw their bill of exchange for four thousand four hundred dollars, on the 28th of September, 1867, on said Maynard & Son, Boston, on account of said shipment?" Answer, "Yes."

"13. Did not said Lamb & Quinlin sell said bill of exchange and said bill of lading on the 28th of September, 1867, to the Merchants National Bank of St. Louis, Missouri, for a valuable consideration?" Answer, "Yes."

"14. Had said Merchants National Bank of St. Louis, Missouri, any notice when they bought said bill of exchange and bill of lading that the plaintiffs had any claim upon said flour?" Answer, "No."

NOVEMBER TERM, 1870. 7

The Union R. R. and Transp'n Co. and Another *v.* Yeager and Another.

"15. What was the value of said flour at the time it was replevied by the plaintiffs?". Answer, "Five thousand dollars."

"16. Did not Yeager & Co. settle with the said Fruedenau by accepting the dray tickets from him for the said four hundred barrels of flour with a knowledge of the fact that said flour had been shipped?" Answer, "No."

There was a motion by the defendants for a new trial for the following reasons:

First. The court erred in suppressing and excluding from the jury all the evidence offered by the defendants in relation to the custom as to what were considered cash sales in St. Louis.

Second. The court erred in permitting plaintiffs to prove the course of trade in St. Louis, over the defendants' objection.

Third. The court erred in overruling the instructions asked for by the defendants to the jury, numbered 1, 2, and 3.

Fourth. The court erred to the defendants' prejudice in expounding the law to the jury, and in giving charges, 1, 2, 3, 4, 5, 6, 7, 8, and 9.

Fifth. The finding of the jury is contrary to the evidence.

Sixth. The answers of the jury to interrogatories numbered 6, 7, 8, and 16, are not supported by the evidence.

Seventh. The finding of the jury is contrary to the law and the evidence.

Eighth. The court erred in suppressing and excluding evidence offered to the jury by defendants.

Ninth. The court erred in permitting incompetent, irrelevant, illegal, and secondary evidence to be given to the jury by the plaintiffs over defendants' objection.

Tenth. The court erred to defendants' prejudice in amending the instructions asked by the defendants, before giving said instructions to the jury.

This motion was overruled, and final judgment was rendered for the plaintiffs. The defendant excepted, and by a bill of exceptions put the evidence in the record.

There are twenty-two errors assigned, which, so far as they properly present any question, we will proceed to consider.

The first five relate to the action of the court in overruling the demurrers to the special paragraphs of the reply.

It is not necessary for us to decide these questions. The complaint alleges the plaintiffs' ownership of the property, and their right to the possession thereof. Under the general denial contained in the answer, the plaintiffs were bound to establish these facts as against every one else. Everything alleged by the defendants in the special paragraphs of their answers was admissible under the general denial; and everything alleged by the plaintiffs in their reply was admissible under the allegations in the complaint. Whatever facts the plaintiff must establish in order to make out his case, the defendant may controvert under the general denial in his answer. 2 G. & H. 113, sec. 91. Special paragraphs in an answer, or a reply, not by way of confession and avoidance, are unnecessary, and tend to needless prolixity and confusion. If we should examine these questions, and find that the special paragraphs of the reply were bad, we ought not to reverse the judgment for that reason; for it is evident that the parties litigated, and that the jury decided, the matters alleged in the complaint, which were put in issue by the general denial in the answer. See *Carter* v. *Thomas*, 3 Ind. 213.

The sixth, eighth, and twelfth alleged errors relate to suppressions of parts of the plaintiffs' depositions.

These portions of the evidence were offered for the purpose of proving the existence of a custom or usage in St. Louis, Mo., that cash sales were not made for cash in hand, but that the payment might be made some days afterwards, and the transaction still be regarded as a sale for cash. Quinlin in his deposition says, the usual time for collecting bills was, at the time of this transaction, *three days after* the property was *delivered;* but when his deposition was taken the the custom was to pay *on delivery;* that previous to the sale in question, within a year or two, the custom had not changed to his knowledge. Merret says, the custom was to pay in

The Union R. R. and Transp'n Co. and Another *v.* Yeager and Another.

from three to five, ten, fifteen, twenty, and twenty-five days, and that all these are called cash sales. Robinson says, the custom was to present the bill and collect it about three days after the *date of the bill*, the bill being dated on the day of sale or delivery. The date of the delivery was the custom, because it was always delivered when sold, for there was no holding over. Any exceptions to that would be on special agreement. This was the custom on September 1st, 1867. It has been changed since, about the 1st of October, or sometime in October. It was after the 3d of October. The reason he knows it was, is because it was after the failure of Lamb & Quinlin. Resolutions to that effect have been adopted by the Chamber of Commerce.

It seems to us that if there was any such custom as contended for, this evidence did not tend to prove it. No two of the witnesses agree as to what it was. Its protean form is recognized, at one time as giving three days, and again as giving twenty-five days; sometimes counting from the day of sale, and sometimes from the date of delivery. Then it is evanescent. It is in full force in one month, and gone the next. Certainty is one of the requisites of a good custom. There was no error in this action of the court. See, as to custom, *Harper* v. *Pound*, 10 Ind. 32; *Cox* v. *O'Riley*, 4 Ind. 368; *Carlisle* v. *Wallace*, 12 Ind. 252.

The seventh, ninth, tenth, eleventh, fourteenth, fifteenth, and sixteenth assignments of error, relate to the refusal of the court to suppress parts of the plaintiffs' depositions. We see no error in this ruling. And, aside from these parts of the evidence, the case was made out.

The seventeenth alleged error relates to the improper admission in evidence of the statute of frauds of Missouri.

This, if an error, was harmless, as the case does not turn on the question whether the contract was or was not within the statute of frauds. The leading facts in the case are, that Yeager & Co. had purchased one thousand barrels of flour, to be manufactured at the Union Steam Mills in St. Louis. They had received all of it except four hundred barrels. Before

this was manufactured, a parol agreement was made by Yeager & Co. to sell it to Lamb & Quinlin, of St. Louis. The South-Western Freight and Cotton Press Company, an organization owning no railroad of its own, or other means of transportation, through its officers or agents, gave to Lamb & Quinlin what they style a bill of lading, by which they acknowledged the receipt by said company of the flour from Lamb & Quinlin, and agreed to .transport it to Maynard & Son, of Boston, Mass. This paper bears date Sept. 26th, 1867, at which time none of the four hundred barrels of flour had been manufactured. By some means, the brand of Lamb & Quinlin, " Little Beauty," got to the mill, and as the flour was made, was put on the barrels; but it does not appear that this was known to Yeager & Co. The transfer company is an organization engaged in transferring freight across the Mississippi river to and from St. Louis. The servants of this company took the flour from the Union Steam Mills when it was manufactured and branded, conveyed it to the opposite side of the river and put it in the custody of the railroad company, giving dray tickets for it to the superintendent of the mill. One hundred barrels were thus transferred on the 28th day of September, 1867, manufactured from seven o'clock A. M. to three o'clock P. M., on that day; one hundred and fourteen barrels were delivered on the 30th of the same month, about the same hour; and the residue on the 1st day of October, 1867. Yeager had told the superintendent of the mill that he had sold the four hundred barrels of flour to Lamb & Quinlin. No written order was produced by or from any one to the superintendent of the mill to deliver the flour to the transfer company.

On the 28th day of September, 1867, Lamb & Quinlin drew on Maynard & Son, payable to their own order, for four thousand four hundred dollars, chargeable to account of the four hundred barrels of flour, and sold the same to the Merchants National Bank of St. Louis, and transferred to the bank the instrument given to them on the 26th day of September, 1867, by the South-Western Freight and Cotton Press

The Union R. R. and Transp'n Co. and Another *v.* Yeager and Another.

Co., as security. This company acted as agent for the railroad company, and received a percentage on the amounts derived from conveying the freight which it obtained for the railroad. On the 1st day of October, 1867, the South-Western Freight and Cotton Press Co. obtained a bill of lading from the railroad company for the same flour, to be delivered to the same consignee mentioned in the instrument which they had given to Lamb & Quinlin.

Yeager & Co., hearing of the embarrassment of Lamb & Quinlin, inquired of the superintendent of the mill about the flour, got the dray tickets of him, and went with them and a bill for the flour, on the 2d of October, 1867, to Lamb & Quinlin, and requested payment for the flour, which not being made, they told them that they would keep the tickets and make some other disposition of the flour. Lamb & Quinlin became insolvent about the 1st, 2d, or 3d of October, 1867. Yeager & Co. went to the railroad company with the dray tickets of the transfer company and demanded a bill of lading for the flour, which was refused, the agent of the company saying that they had already given a bill of lading to another party. No order, oral or written, from Yeager & Co. for the delivery of the flour from the mill is shown. On the contrary, it is shown that the agents of the transfer company got their orders from an agent of the South-Western Freight and Cotton Press Co., and he got his authority from Lamb & Quinlin.

The nineteenth alleged error relates to and calls in question the correctness of the instructions given to the jury. They are as follows:

1. If a bargain of sale of goods is made, to be paid for, cash on delivery, and the buyer under such bargain gets possession of the same without payment and without the knowledge or consent of the seller, such possession is without right and without even color of right; and no act of the party so coming into possession of such property can vest the property or right of possession in any other person than the seller.

2.  The consent of both parties is necessary to constitute a delivery—the seller's consent to part with the possession, and the buyer's to receive it. The unauthorized act of the custodian of the property of another in parting with the possession cannot bind the owner, unless such act is ratified by the owner; and the ratification of such act will be the same as original authority: but an act cannot be ratified, only on full knowledge of all the facts of the case; and when a ratification of an unauthorized act is relied on, the party relying on it is bound to show by a preponderance of evidence that the other in ratifying the unauthorized acts had full knowledge of all the material facts.

3.  In such transactions as in this case have been brought before the jury in evidence, it is proper to consider the usual course of business where they occurred; if it was the usual course of business for the delivery of property subject to shipment to distant places to be by delivery of receipts for the same by intermediate and local carriers, then delivery and acceptance of such receipts would be such delivery as the law would recognize; and if a party making sale to a second party delivered the property sold to local carriers unconsigned, and it was in usual course of business for such carrier to deliver to other carriers for further transportation, who held the property until consigned by the holders of receipts last named (of local carriers), the acceptance of such receipts would be an acceptance of the property by the second party: but the delivery by the local carrier to some third person, or to some other carrier to carry on account of some third person who had no right to the property, would not divest the owner of the right of the property, and he would have the right to possession wherever he could find it.

4.  If you believe, from the evidence, the Union Steam Mills Company sold the flour in controversy to plaintiffs, and the mill company delivered it to the local carriers, the transfer company, unconsigned, and it was the usual course of business for such local carrier to deliver to other carriers for further transportation, who, in the usual course of business,

would hold the flour until consigned by the holder of the transfer company's receipts, then the acceptance of such receipts by the plaintiffs would be an acceptance of the flour from the mill company. But if the flour was delivered by the transfer company to some other carrier, without the consent of plaintiffs, to be carried on account of Lamb & Quinlin, and they had no right to the possession of the same until payment of the price of the flour or a waiver by plaintiffs of the cash element of the sale, such act would not divest the plaintiffs of the right of possession, and they would have the right of possession wherever they could find the flour. And no act of Lamb & Quinlin, in such event, could divest the right of plaintiffs.

5. A bill of lading, to be of any effect, must be given upon possession of the property by the party giving the bill, at the time the bill is given; but the bill may become effective by the after-acquired possession by the carriers of the property named in it: such possession must be a valid possession with the consent or acquiescence of the owner of the property; but possession acquired without that is wrongful, and the transfer of the bill of lading to an innocent purchaser would not affect the right of the real owner, unless he had voluntarily parted with its possession to the person or the agent of the person making the shipment.

6. If, then, you believe from the evidence that a bargain of sale was made by the plaintiffs to Lamb & Quinlin of the flour in controversy, to be paid for, cash on delivery, and that Lamb & Quinlin got possession of the same without the consent or knowledge of the plaintiffs, and without paying the price for the same, then Lamb & Quinlin acquired no property in the flour, and could transfer none; and in that event, unless you believe from the evidence that the plaintiffs ratified the acts of the Union Steam Mills Co., in delivering the flour, to the transfer company, and also the further acts of the transfer company in delivering the same to Lamb & Quinlin, or upon their order, then your verdict should be for the plaintiffs.

7. But if you believe, from the evidence, that plaintiffs

consented to the delivery of the flour to Lamb & Quinlin or their agents, although such consent was or might have been procured by fraudulent representations or promises; and by means of a bill of lading the property was then transferred to an innocent purchaser, such innocent purchaser would hold the property free from any claim of the owners; but to make the title of such purchaser good, however innocent he might be, the possession must have been procured by the consent or acquiescence of the owners, or the owners, with full knowledge of all the facts, must have ratified the acts by which the possession was acquired.

8. If the jury believe from the evidence that, at the time, by the usage of trade in St. Louis, the dray tickets or receipts of the transfer company were regarded and treated as a badge of possession and ownership in the person who held them, and that a delivery of these dray or transfer tickets was, according to such usage of trade, the invariable mode of delivering property intended for shipment by the seller to the buyer, and that in this case the dray or transfer tickets were retained by plaintiffs and not delivered, then the retention of such tickets is a fact tending to prove that the delivery was not complete.

9. If the jury believe, from the evidence, that Lamb & Quinlin purchased from the plaintiffs the flour in controversy, and under color of such purchase, with the knowledge and consent of plaintiffs, Lamb & Quinlin obtained possession of the flour, and shipped the same to Maynard & Son, Boston, and obtained a bill of lading from the carriers for the same, and then drew a bill of exchange on Maynard & Son, at Boston, for the price or value, or a part of the price or value of the same, and then sold said bill of exchange and bill of lading to the Merchants National Bank of St. Louis, for a valuable consideration, and said bank bought the bill of exchange and bill of lading without knowledge of the claim of plaintiffs, then the bank became a purchaser in good faith, and in such case you should find for the defendants.

As we have already seen, the questions in the case were

the plaintiffs' ownership and right to the possession of the property. These were denied, and hence the plaintiffs were bound to prove them. They did this by showing the ownership of the flour while at the mill. The mere agreement on their part to sell the flour could not pass the title and give the right to Lamb & Quinlin to go and take it without their order, and without paying for it, unless payment at or before the delivery was waived, in which case delivery by them or by their order would pass the title without payment. Hence the question whether or not Yeager & Co. had thus consented to the delivery of the flour was the principal question of fact in the case. So far as the instructions relate to this, we can see no objection to them. While there was little or no evidence on the point, we think the law is correctly stated with reference to the ratification of an unauthorized delivery.

With reference to the bill of lading, as it is called, we think the instructions were more favorable to the defendants than they should have been. There are various definitions of the term "bill of lading," agreeing in substance. It is a memorandum or acknowlededement in writing, signed by the captain or master of a ship or other vessel, that he has received in good order, on board of his ship or vessel, therein named, at the place therein mentioned, certain goods therein specified, which he promises to deliver in like good order (the danger of the seas excepted) at the place therein appointed for the delivery of the same, to the consignee therein named, or to his assigns, he or they paying freight for the same. Bouvier's Law Dictionary.

Though applicable originally to carriers by sea, it seems now to be agreed, and we see no reason to the contrary, that a similar instrument issued by a carrier by land will have the same force and effect in law. Bouvier's Law Dic.; 1 Parsons on Shipping and Admiralty, 134.

The indorsement of a bill of lading by the owner of the goods passes the property in the goods to the indorsee. *Law* v. *Hatcher*, 4 Blackf. 364; Addison on Con., 205.

In this case, the goods in question, the flour, was not even

manufactured at the time of the making of the instrument characterized as a bill of lading, and was at no time in the possession, actually or constructively, of the South-Western Freight and Cotton Press Company, or its agents, for the purpose of being carried by that company. It had no means of carrying it, and never intended to do so. Whatever other properties the instrument executed by that company may have had, it cannot be regarded as a bill of lading. To hold it to be valid as such, would be to hold that every agent and every runner of a vessel, railroad, or other common carrier, may issue paper, in his own name, to which the law would attach the legal characteristics of bills of lading.

The transfer of such instrument by Lamb & Quinlin to the Merchants National Bank of St. Louis, could not, and did not, confer upon the bank the ownership of the goods in question, for the reasons given, even if Lamb & Quinlin had a property therein. So far, then, as the circuit court authorized the jury to consider the instrument in question as a bill of lading, the transfer of which would confer upon the bank a property in the goods, the instructions were more favorable to the defendants than they should have been.

The instructions which the court was requested by the defendants to give, and which it refused to give, are as follows:

1. If the jury find, from the evidence, *that* Lamb & Quinlin purchased from Yeager & Co. the flour in controversy, and under color of said contract Lamb & Quinlin obtained possession of said flour at St. Louis, and shipped the same to Maynard & Son, Boston, and obtained a bill of lading from the carriers for the same, and then drew a bill of exchange for the price of said flour on Maynard & Son, at Boston, and then sold said bill of exchange and bill of lading to the Merchants National Bank of St. Louis, for a valuable consideration, and said bank bought said bill of exchange and bill of lading without any knowledge of the claim of plaintiffs, then said bank became a purchaser in good faith, and you must find for the defendant, said Merchants National Bank of St. Louis.

2. If the jury find for the defendants, then they must find the value of the flour at the time it was replevied by plaintiffs, and also the damages defendants have sustained for the detention thereof since it was replevied; and the criterion of damages would be interest on the value found.

3. If the jury believe, from the evidence, that after the flour in controversy was delivered to the transfer company by Fruedenau, at the Union Steam Mills, and Lamb & Quinlin had shipped the flour to Boston, Yeager & Co. accepted said delivery by Fruedenau in fulfilment of his contract with Yeager & Co., such acceptance was a delivery of the flour to Lamb & Quinlin, and the title passed to Lamb & Quinlin and from them to the bank.

The first of these charges was too indefinite to go to the jury. What was meant by the words, "under color of said contract?" If it meant that because Lamb & Quinlin had contracted for the flour, that they, or any one for them, could send and take it from the mill without the authority of the plaintiffs and without having paid for it, then it was rightly refused, for they could not acquire any right to the flour in such way. *Robinson* v. *Marney*, 5 Blackf. 329; *Bradley* v. *Michael*, 1 Ind. 551.

As the second charge asked and refused related only to the form of the verdict of the jury in the event they should find for the defendants, and as they did not find for them, it is evident that no harm was done in refusing it.

Nor do we think the third instruction asked and refused should have been given. Fruedenau was the superintendent of the mill. He asked for an order when the servants of the transfer company came for the flour. They had none. He delivered the flour, taking the dray tickets from the transfer company, marked "on account of Yeager & Co., or left blank for his own account." He delivered these tickets to Yeager & Co.; but says expressly, "I had no authority from Yeager & Co. to deliver flour to Lamb & Quinlin; and delivered none to them." It is the acceptance of these "tickets" by Yeager

& Co. which it is insisted had the effect to work a delivery of the flour to Lamb & Quinlin.

We think there was no reason for granting a new trial. The flour in question was the property of Yeager & Co. while at the mill, and it is not shown that it was ever transferred by their consent to Lamb & Quinlin. The bank will have to look to some other source than the flour in question, if there be any other within its reach, for reimbursement.

The judgment is affirmed, with costs.

*F. Rand* and *R. H. Hall*, for appellants.

*G. P. Strong, A. G. Porter, B. Harrison*, and *W. P. Fishback*, for appellees.